UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEREL MATTHEWS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:17-cv-366-GCS |
| | ) |
| KIM BUTLER, | ) |
| JOHN TROST, | ) |
| GAIL WALLS, | ) |
| KENT BROOKMAN, and | ) |
| TREY FRITSCHE | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Jerel Matthews, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges that Defendants Kent Brookman and Trey Fritsche failed to protect him from a violent attack by his cellmate and that Defendant Kim Butler, John Trost, and Gail Walls were deliberately indifferent to his medical needs related to the injuries he sustained at the hands of his attacker. Now before the Court are Defendants' motions for summary judgment (Doc. 76, 99). For the reasons delineated below, the Court grants Defendant Trost's motion and grants in part and denies in part the motion filed by Defendants Butler, Walls, Brookman, and Fritsche.

### FACTUAL BACKGROUND

At all times relevant to his complaint, Matthews was incarcerated at Menard Correctional Center ("Menard"). Defendant Kent Brookman was a lieutenant at Menard, and Defendant Trey Fritsche was a correctional officer. Defendant Kim Butler was the

Warden of Menard. Defendant John Trost was employed by Wexford Health Sources, Inc., and he was a physician who worked as the medical director at Menard. Defendant Gail Walls worked as the healthcare unit administrator.

On February 24, 2016, Matthews was attacked by his cellmate, Frederick Goings. (Doc. 99-1, p. 71). According to Matthews, he was moved to the cell with Goings, and the two men were cellmates for about six weeks. (Doc. 99-1, p. 71-72). Issues arose between the two men immediately. Goings would talk to himself and make threats, one time even saying he would kill Matthews. (Doc. 99-1, p. 72-73). Matthews had concerns about being housed with Goings, and he expressed his concerns to correctional staff. (Doc. 99-1, p. 74). Matthews testified at his deposition that he submitted a written request to the placement officer by putting a note in the bars of his cell, and he spoke to the "white shirts" during shower and at meal times about his concerns. (Doc. 99-1, p. 74-75, 77-78).

Matthews attached to his complaint a copy of a February 11, 2016 letter he wrote to the placement officer. In the letter, he asked to be moved to another cell because his cellmate seemed "to be kind of crazy" and because he did "not feel safe falling asleep around" Goings. (Doc. 1, p. 19). Matthews wrote another letter to the "north uppers lieutenant" dated February 18, 2016. The letter stated that he believed Goings needed mental health assistance because he appeared "to be paranoid and hallucinating." He repeatedly asked for help and to be moved and also stated that he did not trust Goings. (Doc. 1, p. 20). According to Matthews's deposition testimony, these letters or kites, were meant to express the fear he had for his safety. (Doc. 99-1, p. 79-81). Matthews also

testified that he tried to be discreet in his letters because Goings had access to them and read them. (Doc. 99-1, p. 81).

Matthews did not file a grievance about his placement with Goings before the February 24, 2016 attack, though he testified that he was not in the cell long enough to file one. (Doc. 99-1, p. 95-96). Matthews acknowledged that he did not speak to his counselor about his concerns and that he did not ask to be placed in protective custody. (Doc. 99-1, p. 82-84). He explained that the lieutenant and sergeant "move faster" than a counselor and that protective custody did not feel necessary because he was not in danger simply by being in general population. He believed if he moved out of the cell with Goings, then he would be safe. (Doc. 99-1, p. 83-84).

Matthews also explained that he substituted Defendants Brookman and Fritsche for the earlier-named John Doe defendants because they were working at the time he was attacked. (Doc. 99-1, p. 93-94). He also testified that he could not recall whether he spoke to Defendant Fritsche or Defendant Brookman specifically. Rather, he only recalled talking to the "white shirts" about his concerns. (Doc. 99-1, p. 94-95).

According to an affidavit submitted by Defendant Fritsche, he worked from 7:00 a.m. until 3:00 p.m. as a correctional officer in the north upper 7 gallery on February 24, 2016. The north upper 7 gallery is one flight of stairs above 5 gallery, where Matthews was attacked. Fritsche describes his duties as maintaining safety and security, conducting the morning count of the inmates, running passes, checking on the back of the gallery, and giving letters from inmates to the sergeant on duty. As a correctional officer, Fritsche wore a blue shirt. (Doc. 99-2).

Around 2:25 p.m. on February 24, 2016, Fritsche walked down the stairs from 7 gallery to 5 gallery and heard a commotion. He radioed for the north upper sergeant, and they went to investigate. He saw Matthews lying on the floor in a pool of blood in his cell, and he notified the sergeant, who followed the chain of command for receiving medical assistance for Matthews. Fritsche maintains that it was not part of his job to collect letters from inmates in 5 gallery, that he does not respond to grievances, and that he does not provide medical assistance. (Doc. 99-2).

Defendant Kent Brookman was a lieutenant and the supervising chairman of the adjustment committee at Menard on February 24, 2016. He worked that day from 7:00 a.m. until 3:00 p.m. As a lieutenant, Brookman describes his duties as ensuring safety and security of both the inmates and the correctional officers. He made sure that officers performed inmate counts, that they were running passes and ensuring line movement, and that checks on the back of the gallery were performed properly. As supervising chairman of the adjustment committee, he ensured that disciplinary hearings were scheduled, and he reviewed and held hearings on disciplinary matters. (Doc. 99-5).

At approximately 2:25 p.m. on February 24, 2016, Brookman was supervising outside the N1 cell house when he was radioed to respond to 5 gallery. When he got there, he saw Matthews lying in a pool of blood in his cell. Medical assistance was called before he got to Matthews's cell. Matthews was taken to the healthcare unit in a wheelchair and left Menard on an emergency medical furlough. According to Brookman, he does not collect mail or letters from inmates in 5 gallery, and he does not provide medical assistance. (Doc. 99-5).

Healthcare unit staff who responded to Matthews's cell determined that he had severe head trauma and blood loss. He was placed in a c-collar and was trauma packaged for transport to the healthcare unit. Once there, a request for an ambulance was made, and a medical furlough was secured to allow for the transfer of Matthews from the healthcare unit to Chester Memorial Hospital. (Doc. 77-3, p. 4; 77-4). At the hospital, Matthews was examined by Dr. Mohammed Jendi. Dr. Jendi conducted a neurological examination and concluded that Matthews was alert and oriented, and he recommended observation. (Doc. 77-5, p. 3-5).

Matthews was examined by Dr. James Krieg at the hospital on February 25, 2016. Dr. Krieg conducted a neurological examination and found that Matthews had no paralysis and no sensory defects. Matthews was awake and oriented, and Dr. Krieg documented that, neurologically, Matthews was stable and alert. (Doc. 77-5, p. 6-12). Matthews was discharged from the hospital and returned to the infirmary at Menard. The instructions to the healthcare staff included continued monitoring of Matthews's neurological status and suture care. (Doc. 77-5, p. 12).

Matthews arrived at the infirmary around 10:30 a.m., and a nurse examined him and documented that he was alert and oriented. The plan was for Matthews to undergo a 23-hour observation. (Doc. 77-3, p. 4; Doc. 77-4). He was next examined by a nurse at 3:00 p.m. Matthews reported that he was in pain and asked if it was time for pain medication. He was given pain medication, and his vital signs were checked. The nurse documented that he was alert and oriented and that his sutures were intact with no bleeding. (Doc. 77-3, p. 5).

A nurse checked on Matthews again at 3:00 a.m. on February 26, 2016, and documented that he said, "Ya, I'm good." He was given tramadol for his pain, and the nurse noted that his vital signs were stable and that he was alert and oriented. (Doc. 77-3, p. 6). Dr. Trost examined Matthews at 8:26 a.m. and noted that Matthews's pain was controlled and that his facial swelling was decreasing. He also charted that neuro was "intact." (Doc. 77-3, p. 6). At 8:45 a.m., a nurse examined Matthews. According to the medical records, Matthews told her that he was "ok" and was sitting up in bed with no acute distress. He was alert and oriented, and he was able to ambulate and was steady on his feet. He had some vision in his right eye, as well. (Doc. 77-3, p. 7).

On February 27, 2016, a nurse noted that a request to continue to keep Matthews in the healthcare unit on a security hold was granted. Matthews was examined by a nurse that day as well, with the nurse making limited notes about a concussion. He was examined by nursing staff twice on February 28, 2016. (Doc. 77-3, p. 8-9). The security hold was extended again on February 29, 2016. (Doc. 77-3, p. 9). On March 1, 2016, Matthews was examined by a nurse, and the nurse noted that he denied having any complaints. (Doc. 77-3, p. 10). On March 2, 2016, Matthews asked a nurse examining him if he could have his sutures removed. (Doc. 77-3, p. 10). He saw Dr. Trost at 9:12 a.m. that morning, and Dr. Trost noted that Matthews was feeling better but that his eye was still swollen shut. He also noted that he planned to remove Matthews's sutures going forward. (Doc. 77-3, p. 11).

Matthews saw a nurse on March 3 and March 4, and he had his sutures removed on March 4, 2016. (Doc. 77-3, p. 11-12). Matthews also saw a nurse on March 4, 2016, and

he reported constipation but denied having any nausea or vomiting. A nurse examined him and gave him milk of magnesia to treat his constipation. (Doc. 77-3, p. 13). On March 5, 2016, a request to keep Matthews in the healthcare unit on a security hold was granted. The hold was extended again on March 6, and a nurse met with Matthews for sick call. He reported no issues. (Doc. 77-3, p. 13).

Dr. Trost examined Matthews at 7:55 a.m. on March 7, 2016. Dr. Trost noted that Matthews had no complaints and that his facial swelling was resolved. His treatment plan included discharging Matthews back to his cell house and scheduling a follow-up appointment with an eye doctor. (Doc. 77-3, p. 14). A nurse met with Matthews around 10:00 a.m. and noted that he said, "I'm ready to go." (Doc. 77-3, p. 14).

Dr. Trost prepared an inmate discharge summary on March 7, 2016, which documented that Matthews was being discharged in good condition and that the treatment plan included a follow-up with an eye doctor. He also noted that current medications should continue. (Doc. 77-3, p. 15). At his deposition, Matthews testified that he did not recall whether he requested or presented to healthcare staff for a sick call after his discharge on March 7, 2016. (Doc. 77-1, p. 7). According to Dr. Trost's affidavit submitted with his motion for summary judgment, Matthews did not request treatment through a sick call after March 7, 2016. (Doc. 77-4, p. 8). Matthews was seen by an eye doctor on April 1, 2016. (Doc. 1, p. 13).

According to his complaint, Matthews was locked in a room in the prison's infirmary before his release on March 7, 2016. He claims that he was not examined by healthcare staff, as recorded in the medical records, nor was he given neurological tests

to monitor his condition. He maintains that he saw Defendant Trost for suture removal, but that was the only time he was seen by a doctor after returning from Chester Memorial Hospital. In his response to Defendant Trost's motion for summary judgment, Matthews, contrary to the allegations in his complaint, agrees that he was seen by healthcare staff during his security hold as reported in the medical records. He does not dispute the accuracy of the records. Instead, he challenges whether the care he received was sufficient, was as described by the notes, or was appropriate to his needs.

On March 8, 2016, Matthews filed a grievance related to his attack in which he complained about his medical care during his security hold in the healthcare unit. He asked for a transfer to a different facility and for compensation for his physical and mental injuries. He did not request additional or different medical care. Defendant Butler, or a signatory for her, marked the grievance as a non-emergency on March 23, 2016. (Doc. 1, p. 11-12). Defendant Walls sent a memorandum to Matthews dated April 5, 2016, responding to his complaints. She noted his appointment with the eye doctor and that he had not submitted a sick call request since February 29, 2016. Walls told Matthews to follow sick call procedure if he had any further medical issues. (Doc. 1, p. 13).

Defendant Gail Walls submitted an affidavit along with her motion for summary judgment. In it, she explains that in her role as the healthcare unit administrator, she coordinates and reviews activities of the healthcare operations along with the medical director and the nursing director. She does not decide when an inmate is placed on a security hold, nor does she order particular treatments for inmates or make referrals to

specialists. Her role in the healthcare unit was administrative, and she did not regularly treat patients. (Doc. 99-4).

As narrowed by the Court's threshold order (Doc. 8), Matthews alleges that Defendants Brookman and Fritsche failed to protect him from the risk of an attack by his cellmate (Count 1) and that Defendants Trost, Walls, and Butler were deliberately indifferent to his serious medical needs in the wake of the attack (Count 3).

## LEGAL STANDARDS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the

evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II. Eighth Amendment Failure to Protect

The Eighth Amendment prohibition on cruel and unusual punishment places a duty on prison officials to protect prisoners from violence at the hands of other prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To establish a violation of this right, a prisoner must demonstrate that a prison official was deliberately indifferent to an excessive risk to the prisoner's health or safety, which includes an objective and a subjective component. *Id.* First, the harm to which the prisoner was exposed must be one that is objectively serious. *See Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). Second, the prison official must have actual knowledge of the risk to the inmate. *Id.* Constructive knowledge is not sufficient to establish a constitutional claim. *Id*.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. "[A] generalized risk of violence is not enough, for prisons are inherently dangerous places." *Wilson v. Ryker*, No. 11-2086, 451 Fed. Appx. 588, 589 (7th Cir. Dec. 12, 2011)(internal citations and quotations omitted). Instead, a plaintiff must allege "a tangible threat to his safety or well-being" and "a substantial risk of future harm." *Id*. Harm to an inmate need not be averted, ultimately, so long as a prison official who actually knew of a substantial risk to inmate health or safety responded reasonably to it. *See Farmer*, 511 U.S. at 844-845.

### III. Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishments, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)(citation omitted).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)(citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750. *Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015)(citing *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir.2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

*Accord Farmer*, 511 U.S. at 828 (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm")(internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). *See also Hammond*, 123 F. Supp. 3d at 1086 (stating that "isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016))(alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *See Berry*, 604 F.3d at 441.

### ANALYSIS

**I.  Count 1: Failure to Protect**

A dangerous, violent cellmate poses a risk of harm that is objectively serious. Brookman and Fritsche focus their arguments in favor of summary judgment on whether Matthews can demonstrate that they had actual knowledge of the risk of harm Goings posed. There is evidence to support that Matthews wrote to the placement officer and to the north uppers lieutenant to describe his fear about sharing a cell with Goings. Matthews also described telling, or attempting to tell, the "white shirts" during shower and at meal times about his issue with Goings. At Menard, lieutenants wear white shirts, while correctional officers wear blue.

The undisputed facts demonstrate that Fritsche was a correctional officer, not a "white shirt," and that he was not assigned to the gallery where Matthews was housed. While a correctional officer would have collected Matthews's letters to the placement officer and to the north uppers lieutenant, there is no evidence before the Court that

would allow a reasonable juror to conclude that Fritsche collected the letters because he was not assigned to the gallery where Matthews was housed.

The record contains insufficient evidence that Fritsche had actual knowledge of any risk posed to Matthews by Goings. Instead, the evidence shows that his role in the conduct alleged in the complaint was that of responding to the attack by Goings. Matthews conceded that he named Fritsche because he was on duty at the time he was attacked, but, without more, a reasonable juror could not conclude that Fritsche had actual knowledge of any risk of harm to Matthews.

As to Brookman, he was a lieutenant, or a "white shirt," during the time period when Matthews tried to get help with a cell reassignment. It is not clear from the record whether Brookman was the "north uppers lieutenant" to whom the February 18, 2016 letter was addressed, but that letter is sufficient to notify the recipient of the risk of harm. In the letter, Matthews described Goings as paranoid and hallucinating. He asked for help and to be moved, and a reasonable juror could conclude that the recipient of the letter had actual knowledge of the risk of harm to Matthews. While Brookman's affidavit states that it was not his job to collect letters from inmates, he does not state that he did not receive or review letters from inmates or from Matthews, specifically. Nor does Brookman address whether he was one of the "white shirts" that Matthews attempted to talk to when Goings was not with him. Drawing inferences in favor of Matthews as the non-movant, a reasonable juror could conclude that Brookman had actual knowledge of the risk to Matthews, and this question is best left to a trier of fact.

## II. Count 3: Deliberate Indifference to Serious Medical Needs

Clearly, Matthews's grievous injuries constituted a serious medical need, as even a layperson would recognize his need for emergency care in the wake of a violent attack. From the medical records, it appears that Matthews was observed regularly after his return from Chester Memorial Hospital and that healthcare staff monitored his condition and his sutures, as directed. Matthews maintains that members of the healthcare staff did not perform necessary neurological testing and that they failed to diagnose, or ignored the possibility that he had, a concussion from the violent attack. In support, Matthews points to a February 27, 2016 note about a concussion as evidence that medical staff knew or should have known about the potential dangers.

Dr. Trost was aware of Matthews's medical needs, as the medical records reflect that he examined Matthews on three occasions before his discharge from the healthcare unit. As to Matthews's claims about an undiagnosed and untreated concussion, Dr. Trost maintains that a head CT and facial x-rays taken of Matthews were negative for signs of a concussion and that no physician diagnosed Matthews with a concussion. Even if a concussion diagnosis was missed, and there is little to no evidence to support this, the instant litigation does not include claims of medical negligence.

Without delving into determining whether Matthews had a concussion, diagnosed or not, what is clear and undisputed is that healthcare staff either provided, or ensured Matthews was provided with, appropriate medical care in the wake of his attack. Matthews was taken to the emergency room. There is no material dispute that he received appropriate care at the hospital. He was returned to the prison, and he abandoned his

claim that he was locked in a room alone without being seen by healthcare staff. As a result, the record reflects that healthcare unit staff, including Dr. Trost on three occasions, monitored and checked in on Matthews until his suture removal and eventual discharge to general population on March 7, 2016. After that date, Matthews did not request any additional treatment or report any concerns or continuing symptoms to healthcare staff. Additionally, during his time in the healthcare unit, medical records contain notes of Matthews saying he was "good" and "ok," and there is no evidence that he made complaints or described symptoms that went unaddressed.

Whether there were different or additional neurological tests that healthcare staff could have performed while monitoring Matthews does not preclude the entry of summary judgment. A prisoner does not have the right to his treatment of choice, and a prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes*, 95 F.3d at 592 (citation omitted). Arguments that care should have been delivered in a different manner cannot carry the day for Matthews unless he can demonstrate that there is a genuine dispute of material fact that the care he received was so deficient as to move past mere negligence to something akin to a reckless disregard. Based on the general agreement as to the accuracy of the medical records, the Court cannot find that a reasonable juror could find that Dr. Trost acted with deliberate indifference towards Matthews.

As to Defendant Walls, she did not provide healthcare treatment to Matthews. Walls sent a memorandum to Matthews after he filed a grievance that raised complaints with the treatment he received during his hold in the healthcare unit. The grievance ultimately sought a transfer to a different facility and compensation for his physical and mental injuries. Butler also was aware of the grievance, marking it as non-emergent on March 23, 2016. Prison officials, like Defendant Butler, ordinarily are allowed to defer to the judgment of medical professionals, but they may not turn a blind eye to a distressed inmate or to the obvious incompetence on the part of treating physicians and nurses. *See Rice ex rel. v. Correctional Medical Services*, 675 F.3d 650, 676 (7th Cir. 2012)(citing *Arnett v. Webster*, 658 F.3d 742, 755-756 (7th Cir. 2011)). Here, without more, marking a single grievance that did not request additional medical treatment as non-emergent is insufficient to demonstrate that Butler ignored obvious incompetence by medical staff.

Similarly, Walls's memorandum to Matthews shows that she was aware of his health issues by April 2016, but there is insufficient evidence that she was deliberately indifferent to his care. She reviewed his records, noted that he was seen for a follow-up appointment with an eye doctor as ordered, and explained that he should avail himself of the sick call process if he was having medical issues. Matthews did not put in a sick call request after his discharge from the infirmary on March 7, 2016, nor does he allege that he attempted to do so but that his attempts were frustrated. The record as a whole does not provide sufficient evidence to allow a reasonable jury to find that any of the medical defendants acted with deliberate indifference towards Matthews's medical needs. As such, they are entitled to summary judgment on Count 3.

## CONCLUSION

For the above-stated reasons, Defendant Trost's motion for summary judgment (Doc. 76) is **GRANTED** and Defendant Butler, Walls, Brookman, and Fritsche's motion for summary judgment (Doc. 99) is **GRANTED in part** and **DENIED in part**. At the close of this case, the Clerk of Court shall enter summary judgment in favor of Defendant Trey Fritsche and against Plaintiff Jerel Matthews on Count 1 and in favor of Defendants Kim Butler, Gail Walls, and John Trost and against Plaintiff Jerel Matthews on Count 3. Plaintiff's claim against Defendant Kent Brookman in Count 1 remains pending.

**IT IS SO ORDERED.**

Dated: March 6, 2020.

Digitally signed by Magistrate Judge Gilbert C. Sison
Date: 2020.03.06 14:12:13 -06'00'

GILBERT C. SISON
United States Magistrate Judge